**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

BRITTANY OUTEN
4652 Pimlico Rd
Baltimore, MD 21215

and

NIKIA BRYANT

1056 Place SE, Unit A
Washington, DC 20019
District of Columbia,

individually and on behalf of all others similarly situated,

*Plaintiffs,*

v.

MEDSTAR HEALTH, INC.,

10980 Grantchester Way, 6th Floor
Columbia, MD 21044
Howard County

*Defendant*.

**Case No: 1:25-cv-3365**

**JURY TRIAL DEMANDED**

# CLASS ACTION COMPLAINT

Plaintiffs Brittany Outen and Nikia Bryant, individually and on behalf of a class of similarly situated persons, bring this Class Action Complaint and alleges the following against defendant MedStar Health, Inc. ("MedStar" or "Defendant"), based upon personal knowledge with respect to Plaintiffs, and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action against MedStar for its failure to properly secure Plaintiffs' and Class Members' personally identifiable information ("PII") and personal health information ("PHI").

2. MedStar failed to comply with industry standards to protect information systems that contain PII and PHI. Plaintiffs seek, among other things, orders requiring MedStar to fully and accurately disclose the nature of the information that has been compromised and to adopt sufficient security practices and safeguards to prevent incidents like the disclosure (the "Data Breach") in the future.

3. MedStar operates over 300 healthcare locations and ten (10) hospitals in Maryland, Washington, D.C., and Virginia.

4. On October 4, 2025, a ransomware group Rhysida posted on the dark web that it had obtained from MedStar over 7 million "pieces of patient personal data," including diagnoses and medication information.

5. This is at least the third time that MedStar has fallen prey to a cyberattack.

6. As a health care provider, MedStar knowingly obtained sensitive PII and PHI and had a resulting duty to securely maintain that information in confidence. Plaintiffs and Class Members would not have provided their PII and PHI to MedStar if they had known that MedStar would not ensure that it used adequate security measures.

7. Plaintiffs seek to remedy these harms individually and on behalf of all other similarly situated individuals whose PII and/or PHI were exposed in the Data Breach. Plaintiffs seek remedies including compensation for time spent responding to the Data Breach and other types of harm, free credit monitoring and identity theft insurance, and injunctive relief, including substantial improvements to MedStar's data security policies and practices.

## PARTIES

8. Plaintiff Brittany Outen is a resident of Baltimore, Maryland and is currently a patient at a MedStar facility in Maryland.

9. Plaintiff Nikia Bryant is a resident of Washington, D.C. and is currently a patient at a MedStar facility in Washington, D.C.

10. Defendant MedStar Health, Inc. is a Maryland corporation, with its principal place of business in Columbia, Maryland.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Minimal diversity exists because Plaintiff Bryant and putative class members reside outside the State of Maryland. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

12. This Court has general personal jurisdiction over MedStar because it is headquartered in and maintains its principal place of business in this District. 28 U.S.C. 1391(a). MedStar is authorized to and regularly conducts business in Maryland.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant is subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL ALLEGATIONS

### The Data Breach

14. MedStar is a not-for-profit health system based in Columbia, Maryland. MedStar operates ten hospitals and more than 300 other health care locations in Maryland, Washington, D.C., and Virginia.[1] MedStar employs more than 35,000 people and generated approximately $8.3 billion in annual revenue as of 2024.[2] In 2024 alone, MedStar had 6,140,570 outpatient visits and 118,861 inpatient admissions.[3]

15. MedStar provides emergency care services and other services offered by hospitals, performs surgeries, provides pediatric care, and psychiatric care, to name a few of its services. Due to the nature of the services it provides, MedStar acquires and electronically stores PII and PHI. MedStar was therefore required to ensure that PII and PHI were not disclosed or disseminated to unauthorized third parties without Plaintiffs' and Class Members' express written consent.

16. On October 4, 2025, the ransomware group Rhysida posted on the dark web that it had obtained MedStar patient's data. Rhysida used the MedStar logo and described the data as coming from the health care organization, including its hospitals, ambulatory care and urgent care centers.

---

[1] *See* About, MedStar Health, Inc., https://www.medstarhealth.org/about (last accessed on Oct. 9, 2025).

[2] *See also* MedStar Health, Inc. Consolidated Financial Statements and Supplementary Information June 30, 2023 and 2022, https://hscrc.maryland.gov/Documents/Strong%20als%20Folder/Audited%20Financials%20-%20ar-rev/FY%202023/MedStar%20AFS_FY%202023.pdf (last accessed on Oct. 9, 2025).

[3] Facts and Figures – MedStar Health, https://www.medstarhealth.org/about/facts-and-figures (last accessed on Oct. 9, 2025).




17. As can be seen in the screen capture above, Rhysida is seeking to sell MedStar patients' PII and PHI for 25 bitcoin.

18. Rhysida boasts "Over 7 million pieces of patient personal data! SQL databases, diagnoses, pharmaceuticals, and much more!"

19. Rhysida also posted a countdown of the amount of time the data would remain available for sale. It claimed that it was only selling to "one hand, no reselling," such that the person who purchases the data would be its exclusive owner.

20. MedStar has not made any public statement as to the Data Breach.

21. This is at least the third time MedStar has been the subject of a data breach. In 2016, a ransomware attack forced MedStar to shut down its computers at all ten of its hospitals while the hacker demanded a ransom in the form of bitcoin payment.[4] MedStar had to operate on paper when handling medical records and prescriptions for patients that they were seeing during the shutdown, which last days.[5] In 2020, MedStar reported that it experienced another breach of its data.

22. Then in 2024, MedStar notified its patients and employees that someone had gained unauthorized access to three MedStar Health employee email accounts, compromising the records of approximately 184,000 individuals.[6]

23. MedStar's failure to disclose any information regarding the Data Breach is inimical to its patients' interests. MedStar should be required to disclose why PII and PHI were stored on systems without adequate security, the deficiencies in the security systems that permitted unauthorized access, whether the data was encrypted or otherwise protected, and what MedStar knows about the degree to which the data has been disseminated.

24. Without such disclosure, questions remain as to the full extent of the Data Breach, the actual data accessed and compromised, and what measures, if any, MedStar has taken to

---

[4] Pete Williams, *MedStar Hospitals Recovering After 'Ransomware' Hack, NBC News* (Mar. 31, 2016), https://www.nbcnews.com/news/us-news/medstar-hospitals-recovering-after-ransomware-hack-n548121 (accessed Oct. 9, 2025); MedStar Hack Shows Risks that Come with Electronic Health Records, Aug. 19, 2019, https://www.baltimoresun.com/2016/04/02/medstar-hack-shows-risks-that-come-with-electronic-health-records/?clearUserState=true.

[5] Pete Williams, MedStar Hospitals Recovering After 'Ransomware' Hack, NBC News (Mar. 31, 2016), https://www.nbcnews.com/news/us-news/medstar-hospitals-recovering-after-ransomware-hack-n548121

[6] Suzanne Smalley, *Nearly 184,000 MedStar Health Patients' Personal Data Possibly Breached*, The Record (May 7, 2024), https://therecord.media/medstar-health-data-breach (accessed Oct. 9, 2025).

secure the PII and PHI still in its possession. Plaintiffs seek to determine the scope of the Data Breach and the information involved, obtain relief that redresses the harm to Plaintiffs' and Class Members' interests, and ensure that MedStar has proper measures in place to prevent similar incidents from occurring in the future.

**MedStar's Security Representations**

25. MedStar's website includes a "Notice of Privacy Practices for MedStar Health" that states that Medstar is "required by law to maintain the privacy of your health information and to give you this Notice of our legal duties, our privacy practices, and your rights. We are required to follow the terms of our most current Notice. When we disclose information to other persons and companies to perform services for us, we will require them to protect your privacy."[7]

26. MedStar further acknowledges that there are multiple privacy laws governing their obligation to protect and disclose any sharing of patient data. MedStar states in its Privacy Policy that "[t]here are other laws we are required to follow that may provide additional protections, such as laws related to mental health, behavioral health, alcohol and other substance abuse, genetic information, and communicable disease or other health conditions."[8]

27. MedStar also states that in the event that it shares information with other healthcare entities, it would "facilitate the secure exchange of your electronic health information."[9] None of those examples account for the disclosure of health information to cyber-criminals.

---

[7] Patient Privacy Policy, Notice of Privacy Policy for MedStar Health, Amended Oct. 30, 2023, https://www.medstarhealth.org/patient-privacy-policy (last accessed Oct. 9, 2025).

[8] *Id.*

[9] *Id.*.

28. MedStar further states that it has an obligation to notify its patients if there is a breach of the patient's health information. "You have the right to be notified if there is a breach of your health information. A breach means health information is acquired, accessed, used, or disclosed in a manner not permitted by law which causes it to be compromised."[10]

**The Healthcare Sector is a Primary Target for Data Breaches**

29. MedStar was on notice that companies in the healthcare industry are susceptible targets for data breaches.

30. MedStar was also on notice that the Federal Bureau of Investigation has been concerned about data security in the healthcare industry. On April 8, 2014, the FBI's Cyber Division issued a Private Industry Notification to companies within the healthcare sector, stating that "the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs)" and pointed out that "[t]he biggest vulnerability was the perception of IT healthcare professionals' beliefs that their current perimeter defenses and compliance strategies were working when clearly the data states otherwise." The same warning specifically noted that "[t]he FBI has observed malicious actors targeting healthcare-related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or PII."[11]

---

[10] *Id.*

[11] Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain (Apr. 8, 2014), FBI Cyber Division Private Industry Notification (available at https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf) (last accessed Oct. 9, 2025).

31. The number of reported North American data breaches increased by over 50 percent in 2021, from 1,080 in 2020[12], to 1,638 in 2021.[13] As a recent report reflects, "[h]ealthcare has increasingly become a target of run-of-the-mill hacking attacks and the more impactful ransomware campaigns."[14]

32. At the end of 2018, the healthcare sector ranked second in the number of data breaches among measured sectors, and had the highest rate of exposure for each breach.[15] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[16] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy.[17]

---

[12] *See* Verizon 2021 Data Breach Investigations Report, at 97, https://www.verizon.com/ business/resources/reports/2021-data-breach-investigations-report.pdf (last accessed Oct. 9, 2025).

[13] *See* Verizon 2022 Data Breach Investigations Report, at 83 (available at https://www.verizon.com/ business/resources/reports/2022/dbir/2022-data-breach-investigations-report-dbir.pdf) (last accessed Oct. 9, 2025).

[14] *Id.* at 62.

[15] *2018 End-of-Year Data Breach Report*, Identity Theft Resource Center (available at https://www.idtheftcenter.org/2018-data-breaches) (last accessed Oct. 9, 2025).

[16] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) (available at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/) (last accessed Oct. 9, 2025).

[17] *Id.*

33. Healthcare-related breaches have persisted because criminals see electronic patient data as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the previous 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[18] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[19]

34. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[20]

35. As major healthcare services providers, MedStar knew, or should have known, the importance of safeguarding Plaintiffs' and Class Members' PII and PHI entrusted to them and of

---

[18] *2019 HIMSS Cybersecurity Survey* (available at https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report. pdf) (last accessed Oct. 9, 2025).

[19] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Apr. 4, 2019 (available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks) (last accessed Oct. 9, 2025).

[20] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019) (available at https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals) (last visited Oct. 9, 2025).

the foreseeable consequences if that data was disclosed. This includes the significant costs that would be imposed on Plaintiffs and Class Members by virtue of a breach. MedStar failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

36. Moreover, MedStar has been the victim of multiple cyberattacks that are very similar to the one that they are facing in this present lawsuit.

37. On March 28, 2016, MedStar discovered that it was the target of a ransomware attack when certain users could not log onto their system.[21] The pop up that appeared when employees tried to log in was a demand for 45 bitcoins in exchange for the release of the digital data.[22]

38. MedStar decided to shut down their entire system and operated using paper records for at least five days as they tried to stop the virus from spreading.[23] The following year in 2017, the Maryland Health Care Commission issued a report on the state of the data breaches in the health care industry and named the MedStar attack one of the "two high profile hacking incidents" in Maryland.[24]

---

[21] Marianne K. McGee, *MedStar Shuts Systems After Cyberattack*, InfoRisk Today, Mar. 29, 2016, https://www.inforisktoday.com/medstar-shuts-systems-after-cyberattack-a-8999 (accessed on Oct. 9, 2025).

[22] John Woodrow Cox, *MedStar Health Turns Away Patients After Likely Ransomware Cyberattack*, Washington Post (Mar. 29, 2016), https://www.washingtonpost.com/local/medstar-health-turns-away-patients-one-day-after-cyberattack-on-its-computers/2016/03/29/252626ae-f5bc-11e5-a3ce-f06b5ba21f33_story.html.

[23] Marianne K. McGee, *MedStar Shuts Systems After Cyberattack*, InfoRisk Today, Mar. 29, 2016, https://www.inforisktoday.com/medstar-shuts-systems-after-cyberattack-a-8999; Andrea McDaniels and Ian Duncan, *MedStar Hack Shows Risks that Come with Electronic Health Records*, The Baltimore Sun (Aug. 19, 2019) (updated), https://www.baltimoresun.com/2016/04/02/medstar-hack-shows-risks-that-come-with-electronic-health-records/?clearUserState=true.

[24] Maryland Health Care Commission, Health Care Data Breaches: A Changing Landscape, 7-8 (June 2017),

39. MedStar Health has reported to the Department of Health and Human Services ("DHHS") Office for Civil Rights that they experienced a hacking incident of its network server on September 25, 2020. On May 3, 2024, the reported another incident to DHHS and sent a letter to almost 184,000 patients notifying them that their data may have been compromised due to unauthorized access of employee email accounts over the course of ten months.[25] The class action lawsuit that resulted was *Riddick v. MedStar Health, Inc.*, Case No. 1:24-cv-01335-BAH. There is currently a proposal to settle the class action lawsuit where MedStar is offering to compensate patients up to $5,000 per putative class member for a total of $1.5 million.[26]

**MedStar Stores Plaintiffs' and Class Members' PII and PHI**

40. MedStar obtained and stored a massive amount of PII and PHI. As a condition of engaging in health care services, MedStar and its affiliates required that patients entrust them with highly confidential PII and PHI.

41. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII and PHI, MedStar assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII and PHI from disclosure.

---

https://mhcc.maryland.gov/mhcc/pages/hit/hit/documents/HIT_DataBreachesBrief_Brf_Rpt_090717.pdf.

[25] Suzanne Smalley, *Nearly 184,000 MedStar Health Patients' Personal Data Possibly Breached*, The Record (May 7, 2024), https://therecord.media/medstar-health-data-breach.

[26] *Riddick v. MedStar Health, Inc.*, Case No. 1:24-cv-01335-BAH, Notice of Proposed Class Action Settlement, https://www.medstarhealth.org/-/media/project/mho/medstar/pdf/class-action-settlement-notice.pdf (accessed on Oct. 9, 2025).

42. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and PHI, and relied on MedStar to keep this information confidential and securely maintained, and to make only authorized disclosures of this information.

**PII and PHI are Valuable and Subject to Unauthorized Disclosure**

43. MedStar was aware that the PII and PHI it collected is highly sensitive and of significant value to those who would use it for wrongful purposes.

44. PII and PHI are valuable commodities to identity thieves. As the FTC recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[27] Indeed, a robust illegal market exists in which criminals openly post stolen PII and PHI on multiple underground websites, commonly referred to as the "dark web." PHI can sell for as much as $363 on the dark web, according to the Infosec Institute.[28] Moreover, "fullz" packages, which include "extra information about [a] legitimate credit card owner in case" a scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[29]

45. PHI is particularly valuable because criminals can use it to target victims with frauds and swindles that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

---

[27] Federal Trade Commission, What To Know About Identity Theft (available at https://consumer.ftc.gov/articles/what-know-about-identity-theft) (last accessed Oct. 9, 2025).

[28] Center for Internet Security, *Data Breaches: In the Healthcare Sector* (available at https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/) (last accessed Oct. 9, 2025).

[29] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud- dark-web/ (last accessed Oct. 9, 2025).

46. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's PHI is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[30]

47. The ramifications of MedStar's failure to keep Plaintiffs' and Class Members' PII and PHI secure are long-lasting and severe. Once PII and PHI are stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for months or even years thereafter.

48. Further, criminals often trade stolen PII and PHI for years following a breach. Cybercriminals can post stolen PII and PHI on the internet, thereby making such information publicly available.

49. Approximately 21% of victims do not realize their identity has been compromised until more than two years after it happens. [31] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of

[30] Michael Ollove, The Rise of Medical Identity Theft in Healthcare, Kaiser Health News (Feb. 7, 2014) (available at https://khn.org/news/rise-of-indentity-theft/) (last accessed Oct. 9, 2025).

[31] *See* Medical ID Theft Checklist (available at https://www.identityforce.com/blog/medical-id-theft-checklist-2) (last accessed Oct. 9, 2025).

medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[32]

50. MedStar knew, or should have known, the importance of safeguarding PII and PHI entrusted to them and of the foreseeable consequences if their data security systems were breached. This includes the significant costs that would be imposed on Plaintiffs and Class Members because of a breach. MedStar failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

**The Data Breach Exposed Plaintiffs and Class Members to Identity Theft and Out-of-Pocket Losses**

51. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of their rights. They are incurring and will continue to incur such damages in addition to any fraudulent use of their PII and PHI.

52. Despite all the publicly available knowledge of known and foreseeable consequences of the disclosure of PII and PHI, MedStar's policies and practices with respect to maintaining the security of Plaintiffs' and Class Members' PII and PHI were reckless, or at the very least, negligent.

53. In virtually all contexts, the expenditure of time has consistently been recognized as compensable, and for many people, it is the basis on which they are compensated. Plaintiffs and Class Members should be compensated for the time they have expended because of MedStar's misfeasance.

[32] Experian, The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches (available at https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf) (last accessed Oct. 9, 2025).

54. Once PII and PHI are stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[33]

55. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer financial loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. invasion of privacy;

b. theft of their PII and PHI;

c. lost or diminished value of their PII and PHI;

d. lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

e. loss of the benefit of their bargain;

f. lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

g. statutory damages;

h. nominal damages; and

i. the continued and certainly increased risk to their PII and PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in MedStar's possession and is subject to further unauthorized disclosures so long as MedStar fails to undertake appropriate and adequate measures to protect the PII and PHI.

[33] 2014 LexisNexis True Cost of Fraud Study (available at https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf) (last accessed Oct. 9, 2025).

**MedStar's Lax Security Violates HIPAA**

56. MedStar had a non-delegable duty to ensure that all PHI it collected and stored was secure.

57. MedStar is bound by HIPAA (*see* 45 C.F.R. § 160.102) and, as a result, is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

58. These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. See 45 C.F.R. § 160.103.

59. HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."

60. HIPAA requires that MedStar implement appropriate safeguards for this information.

61. Despite these requirements, MedStar failed to comply with its duties under HIPAA and their own Privacy Practices. In particular, MedStar failed to:

a. maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. adequately protect Plaintiffs' and Class Members' PHI;

c. ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d. implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. ensure compliance with the electronic PHI security standard rules by their workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

i. train all members of their workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of their workforce to carry out their responsibilities and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b)

62. MedStar failed to comply with its duties under HIPAA despite being aware of the risks associated with unauthorized access to Plaintiffs' and Class Members' PHI.

**MedStar Violated FTC Guidelines**

63. The Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibited MedStar from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' PII is an "unfair practice" in violation of the FTC Act. *See, e.g., Fed. Trade Comm'n v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

64. The FTC has promulgated several guides for businesses that reflect the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[34]

65. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established data security guidelines for businesses.[35] The guidelines reflect that businesses should protect the PII that they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

66. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to confidential data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for

[34] Federal Trade Commission, Start With Security: A Guide for Business (available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) (last accessed Oct. 9, 2025).

[35] Federal Trade Commission, Protecting Personal Information: A Guide for Business (available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf) (last accessed Oct. 9, 2025).

suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[36]

67. The FTC has brought enforcement actions against businesses for failing to protect customer data adequately and reasonably, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68. MedStar failed to properly implement basic data security practices. MedStar's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

69. MedStar was at all times fully aware of its obligation to protect Plaintiffs' and Class Members' PII and PHI because of its position as a healthcare provider. MedStar was also aware of the significant repercussions that would result from its failure to do so.

**Plaintiff Outen's Experience**

70. Plaintiff Brittany Outen is a MedStar patient and has been a patient over the past years at multiple MedStar facilities in Maryland.

71. MedStar obtained Ms. Outen's PII and PHI in the course of conducting its regular business operations.

72. At the time of the Data Breach, MedStar retained Ms. Outen's PII and PHI.

---

[36] FTC, *Start With Security*, *supra*.

73. A ransomware ad on the dark web was posted on October 4, 2025 stating that it had patient data for MedStar patients in Maryland, reflecting that Ms. Outen's PII and PHI were "accessed or acquired without authorization" as a result of the Data Breach.

74. Ms. Outen greatly values her privacy and is very careful about sharing her sensitive PII and PHI. Ms. Outen diligently protects her PII and PHI and takes proactive steps to ensure her PII and PHI are kept safe and secure and stores any documents containing PII and PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII or PHI over the Internet or any other unsecured source.

75. MedStar obtained and continues to maintain Ms. Outen's PII and PHI and has a continuing legal duty and obligation to protect that PII and PHI from unauthorized access and disclosure.

76. The Data Breach has caused Ms. Outen to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from her PII and PHI being placed in the hands of criminals.

77. As a result of the Data Breach, Ms. Outen is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

78. Ms. Outen has a continuing interest in ensuring that her PII and PHI, which, upon information and belief, remain backed up in MedStar's possession, are protected and safeguarded from future breaches.

**Plaintiff Bryant's Experience**

79. Plaintiff Nikia Bryant is currently a MedStar patient at MedStar's facilities in the Washington, D.C. area.

80. MedStar obtained Ms. Bryant's PII and PHI in the course of conducting its regular business operations.

81. At the time of the Data Breach, MedStar retained Ms. Bryant's PII and PHI.

82. A ransomware ad on the dark web was posted on October 4, 2025 stating that it had patient data for MedStar patients in Washington, D.C., reflecting that her PII and PHI were "accessed or acquired without authorization" as a result of the Data Breach.

83. Ms. Bryant greatly values her privacy and is very careful about sharing her sensitive PII and PHI. Ms. Bryant diligently protects her PII and PHI and takes proactive steps to ensure her PII and PHI are kept safe and secure and stores any documents containing PII and PHI in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII or PHI over the Internet or any other unsecured source.

84. MedStar obtained and continues to maintain Ms. Bryant's PII and PHI and has a continuing legal duty and obligation to protect that PII and PHI from unauthorized access and disclosure.

85. The Data Breach has caused Ms. Bryant to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from her PII and PHI being placed in the hands of criminals.

86. As a result of the Data Breach, Ms. Bryant is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

87. Ms. Bryant has a continuing interest in ensuring that her PII and PHI, which, upon information and belief, remain backed up in MedStar's possession, are protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

88. This civil action is properly maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4). Plaintiffs seek certification of the following class:

> All persons in the United States and its territories whose PII and/or PHI was compromised in the Data Breach.

89. Excluded from the Class are MedStar, any entity in which MedStar has a controlling interest, and MedStar's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

90. Plaintiffs reserve the right to modify or amend the definition of the proposed Class as additional information becomes available to Plaintiffs.

91. **Numerosity:** The Class Members are so numerous that individual joinder of all Class Members is impracticable. Upon information and belief, the number of individuals whose PII and PHI was exposed by MedStar affects patients across their ten hospitals and other health care facilities in Maryland and Washington, D.C. area. All Class Members' names and addresses are available from MedStar's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

92. **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether and to what extent MedStar had a duty to protect the PII and PHI of Class Members;

b. Whether MedStar was negligent in collecting and storing Plaintiffs' and Class Members' PII and PHI;

c. Whether MedStar had duties not to disclose the PII and PHI of Class Members to unauthorized third parties;

d. Whether MedStar took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PII and PHI;

e. Whether MedStar failed to adequately safeguard the PII and PHI of Class Members;

f. Whether MedStar failed to implement and maintain reasonable security policies and practices appropriate to the nature and scope of the PII and PHI compromised in the Data Breach;

g. Whether MedStar adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII and PHI had been compromised;

h. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or punitive damages because of MedStar's wrongful conduct;

i. Whether Plaintiffs and Class Members are entitled to restitution because of MedStar's wrongful conduct;

j. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm they face because of the Data Breach; and

k. Whether Plaintiffs and Class Members are entitled to identity theft protection for their respective lifetimes.

93. **Typicality:** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PII and PHI, like that of every other Class Member, was disclosed by MedStar.

Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through MedStar's common misconduct. Plaintiffs are advancing the same claims and legal theories individually and on behalf of all other Class Members, and there are no defenses that are unique to Plaintiffs. Plaintiffs' claims and Class Members' claims arise from the same operative facts and are based on the same legal theories.

94. **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against MedStar to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

95. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because MedStar has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. MedStar's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on MedStar's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

96. **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and

expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like MedStar. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

97. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because MedStar would necessarily gain an unconscionable advantage in non-class litigation, since MedStar would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by Class Members and will establish the right of each Class Member to recover on the causes of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

98. The litigation of Plaintiffs' claims is manageable. MedStar's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with maintenance of this lawsuit as a class action.

99. Adequate notice can be given to Class Members directly using information maintained in MedStar's records.

100. Unless a class-wide injunction is issued, MedStar may continue to maintain inadequate security with respect to the PII and PHI of Class Members, MedStar may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and MedStar may continue to act unlawfully as set forth in this Complaint.

101. MedStar has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

## FIRST CLAIM FOR RELIEF
## NEGLIGENCE
## (on behalf of Plaintiffs and the Class)

102. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

103. The risk that unauthorized persons would attempt to gain access to the PII and PHI and misuse it was foreseeable. As MedStar stores vast amounts of PII and PHI, it was inevitable that unauthorized individuals would attempt to access MedStar's databases, whether by malware or otherwise.

104. PII and PHI are highly valuable, and MedStar knew, or should have known, the risk in obtaining, using, handling, emailing, and storing Plaintiffs' and Class Members' PII and PHI and the importance of exercising reasonable care to those ends.

105. MedStar owed a duty of care to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing MedStar's security systems to ensure that Plaintiffs' and Class Members' PII and PHI in MedStar's possession was adequately secured and protected; (b)

implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

106. MedStar's had a common law duty to prevent foreseeable harm to its customers. This duty existed because Plaintiffs and class members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their PII and PHI because hackers routinely attempt to steal such information and use it for nefarious purposes, MedStar knew that it was more likely than not Plaintiffs and Class Members would be harmed.

107. It was also foreseeable that MedStar's failure to adequately safeguard their PII and PHI in accordance with industry standards for data security would result in the compromise of that PII and PHI. MedStar acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII and PHI by disclosing and providing access to this information to third parties and by failing to properly supervise both the way the PII and PHI were stored, used, and exchanged, and those in its employ who were responsible for those actions.

108. MedStar's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII and PHI by companies such as MedStar. Various FTC publications and data security breach orders further form the basis of

MedStar's duty. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

109. MedStar owed to Plaintiffs and Class Members a duty to notify them within a reasonable timeframe of any breach to the security of their PII and PHI. MedStar also owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. This duty is directed at enabling Plaintiffs and Class Members to take appropriate measures to protect their PII and PHI, to be vigilant in the face of an increased risk of harm, and take other steps to mitigate the harm caused by the Data Breach.

110. Timely notification was required, appropriate, and necessary so that, among other things, Plaintiffs and class members could take appropriate measures to freeze or lock their credit profiles, avoid unauthorized charges to their credit or debit card accounts, cancel or change usernames and passwords on compromised accounts, monitor their account information and credit reports for fraudulent activity, contact their banks or other financial institutions that issue their credit or debit cards, obtain credit monitoring services, and take other steps to mitigate or ameliorate the damages caused by MedStar's misconduct.

111. MedStar owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom MedStar knew or should have known would suffer injury-in-fact MedStar as a result of MedStar's inadequate security protocols. MedStar actively sought and obtained Plaintiffs' and Class Members' PII and PHI.

112. MedStar breached the duties it owed to Plaintiffs and class members described above and thus was negligent. MedStar breached these duties by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices

sufficient to protect Plaintiffs' and Class Members' PII and PHI; (b) detect the breach while it was ongoing; (c) maintain security systems consistent with industry standards; and (d) disclose in a timely fashion that Plaintiffs' and the Class Members' PII and PHI in MedStar's possession had been or was reasonably believed to have been, stolen or compromised.

113. As a direct and traceable result of MedStar's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

114. MedStar's breach of its common-law duties to exercise reasonable care and negligence actually and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII and PHI by criminals, improper disclosure of their PII and PHI, lost benefit of their bargain, lost value of their PII and PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by MedStar's negligence. Those injuries-in-fact and damages are ongoing, imminent, immediate, and Plaintiffs and Class Members continue to face them.

115. As a direct and proximate result of MedStar's negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages in an amount to be proven at trial. Plaintiffs and Class Members injuries include, but are not limited to, the following:

1. losing the inherent value of their PII and PHI;
2. having their private health information, including diagnoses and medications, exposed to people who they did not intend to disclose that information to;

3. losing the value of the explicit and implicit promises of data security;
4. identity theft and fraud resulting from the theft of their PII and PHI;
5. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;
6. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;
7. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

116. Plaintiffs and Class Members are also entitled to injunctive relief requiring MedStar to: (1) strengthen its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) provide adequate credit monitoring to all Class Members.

**SECOND CLAIM FOR RELIEF**
**NEGLIGENCE PER SE**
**(on behalf of Plaintiffs and the Class)**

117. Plaintiffs incorporate the above allegations as if fully set forth herein.

118. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the Federal Trade Commission ("FTC"), the unfair act or practice by companies such as MedStar of failing to use reasonable measures to protect PII and PHI.

119. MedStar also had a duty under FTC Act, 15 U.S.C. § 45 to provide adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII and PHI.

120. Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

121. MedStar had a duty to Plaintiffs and Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' PII and PHI.

122. MedStar violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and PHI and not complying with industry standards. MedStar's conduct was particularly unreasonable given the nature and amount of PII and PHI obtained and stored and the foreseeable consequences of a data breach on its systems, and MedStar's experience with previous breaches.

123. MedStar breached their duty to Plaintiffs and Class Members under the FTC Act by failing to provide reasonable or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII and PHI.

124. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

125. But for MedStar's wrongful and negligent breach of duty owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

126. The injury and harm suffered by Plaintiffs and Class Members were the reasonably foreseeable result of MedStar's breach of its duty. MedStar knew or should have known that MedStar was failing to meet its duties and that the breach would cause Plaintiffs and Class Members to suffer the foreseeable harms associated with the exposure of their PII and PHI.

127. MedStar's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

128. MedStar is a covered entity under HIPAA (42 U.S.C. § 1302d, et seq.). As an entity covered by HIPAA, MedStar had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' PHI.

129. Plaintiffs and Class Members are within the class of persons that HIPAA was intended to protect.

130. Under HIPAA, MedStar had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304 definition of encryption).

131. The harm that occurred as a result of the Data Breach is the type of harm that HIPAA was intended to guard against. The Federal Health and Human Services' Office for Civil Rights has pursued enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures relating to protected health information, caused the same harm as that suffered by Plaintiffs and Class Members.

132. MedStar breached their duties to Plaintiffs and Class Members under HIPAA, by failing to provide reasonable or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PHI.

133. MedStar's failures to comply with applicable laws and regulations constitute negligence per se.

134. But for MedStar's wrongful and negligent breach of the duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

135. The injury and harm suffered by Plaintiffs and Class Members were the reasonably foreseeable result of MedStar's breach of its duties. MedStar knew or should have known that MedStar was failing to meet its duties and that its breach would cause Plaintiffs and Class Members to suffer the foreseeable harms associated with the exposure of their PII and PHI.

136. MedStar's violation of HIPAA constitutes negligence per se.

137. As a direct and proximate result of MedStar's negligence per se, Plaintiffs and Class Members have suffered harm, including:

a. losing the inherent value of their PII and PHI;

b. having their private health information, including diagnoses and medications, exposed to people who they did not intend to disclose that information to;

c. losing the value of the explicit and implicit promises of data security;

d. identity theft and fraud resulting from the theft of their PII and PHI;

e. costs and time associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

f. costs and time associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g. unreimbursed losses relating to fraudulent charges;

h. losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and

i. other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII and PHI, entitling them to damages in an amount to be proven at trial.

138. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

139. Plaintiffs and Class Members are also entitled to injunctive relief requiring MedStar to: (1) strengthen its data security systems and monitoring procedures; (2) submit to future annual audits of those systems and monitoring procedures; and (3) provide adequate credit monitoring to all Class Members.

**THIRD CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(on behalf of Plaintiffs and the Class)**

140. Plaintiffs and Class Members incorporate all previous paragraphs as if fully set forth herein.

141. MedStar offered medical services to Plaintiffs and Class Members. Then, Plaintiffs and Class Members accepted MedStar's services and paid for those services. And when Plaintiffs and Class Members paid for the services, they also provided their PII and PHI to MedStar.

142. Thus, Plaintiffs and Class Members entered implied contracts with MedStar. And so, each paid service before and during the Data Breach was made under these mutually agreed-upon implied contracts with MedStar.

143. Under those implied contracts, MedStar agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members if their information was compromised or stolen.

144. Plaintiffs and Class Members would not have provided and entrusted their PII and PHI to MedStar in the absence of an implied contract.

145. MedStar materially breached the contracts it entered with Plaintiffs and Class Members by:

a. Failing to safeguard and protect the PII and PHI of Plaintiffs and Class Members.

b. Failing to promptly notify Plaintiffs and Class Members of the Data Breach and the subsequent exposure and theft of their PII and PHI.

c. Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement.

d. Failing to ensure the confidentiality and integrity of the electronic PII and PHI that MedStar created, maintained, received, and transmitted.

146. The damages sustained by Plaintiffs and Class Members as described above were the direct and proximate result of MedStar's material breaches of its agreements.

147. Plaintiffs and Class Members performed as required under the relevant agreement, or MedStar's conduct resulted in the waiver of such performance.

148. All contracts include the covenant of good faith and fair dealing. Thus, all contracts impose on each party a duty of good faith and fair dealing. That duty encompasses the following:

a. The parties must act with honesty in fact in the conduct or transactions concerned.

b. The parties must act with good faith and fair dealing when executing contracts and discharging performance and other duties according to their terms so as to preserve the spirit, and not merely the letter, of the bargain.

c. The parties are mutually obligated to comply with both the substance and form of their contracts.

149. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct is justified. Bad faith may be overt or may consist of inaction. And fair dealing may require more than honesty.

150. In this case, MedStar failed to advise Plaintiffs and Class Members of the Data Breach promptly. In these and other ways, MedStar violated its duty of good faith and fair dealing.

151. MedStar, through numerous material breaches of the implied contracts, injured both Plaintiffs and Class Members and sustained actual losses and damages as described above, including that they did not get the benefit of the bargain for which they paid for.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(on behalf of Plaintiffs and the Class)**

152. Plaintiffs and Class Members incorporate all previous paragraphs as if fully set forth herein.

153. This claim is pled in the alternative to Plaintiffs' claim for breach of implied contract.

154. Plaintiffs and Class Members conferred benefits upon MedStar in the form of payments. In addition, MedStar benefitted from receiving Plaintiffs' and Class Members' PII and PHI and from its ability to retain and use that information. Such data is used to facilitate both payment and the provision of services. For instance, by retaining Plaintiffs' and Class Members' PII and PHI, MedStar could offer continued service for a patient visiting more than one time, and not have to ask patients to provide medical history information over and over again. This time saving measure creates additional value for patients and incentivizes them to use MedStar's services again.

155. MedStar also understood and appreciated that Plaintiffs' and Class Members' PII and PHI was private and confidential and its value depended upon MedStar maintaining its privacy and confidentiality.

156. MedStar appreciated or knew of the benefits that it received. Under principles of equity and good conscience, the Court should not allow MedStar to retain the full value of these benefits, specifically, Plaintiffs' and Class Members' payments, PII and PHI.

157. But for MedStar's willingness and commitment to maintain its privacy and confidentiality, that PII and PHI would not have been transferred to and entrusted to MedStar. Further, if MedStar had disclosed that its data security measures were inadequate, MedStar would not have been permitted to continue in operation by regulators and its customers.

158. As a result of MedStar's wrongful conduct as alleged in this Complaint (including, among things, its knowing failure to employ adequate data security measures, its continued maintenance and use of the PII and PHI belonging to Plaintiffs and Class Members without having adequate data security measures, and its other conduct facilitating the theft of that PII and PHI), MedStar has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members. MedStar continues to benefit and profit from its retention and use of the PII and PHI while its value to Plaintiffs and Class Members has been diminished.

159. MedStar's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiffs' and Class Members' PII and PHI, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

160. Under the common law doctrine of unjust enrichment, it is inequitable for MedStar to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiffs and Class Members in an unfair and unconscionable manner. MedStar's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

161. The benefit conferred upon, received, and enjoyed by MedStar was not conferred officiously or gratuitously, and it would be inequitable and unjust for MedStar to retain the benefit.

162. MedStar is therefore liable to Plaintiffs and Class Members for restitution in the amount of the benefit conferred on MedStar as a result of its wrongful conduct, including specifically the value to MedStar of the PII and PHI that was stolen in the Data Breach and the profits MedStar is receiving from the use of that information.

163. MedStar should be compelled to disgorge into a common fund, for the benefit of Plaintiffs and Class Members, all funds that it unlawfully or inequitably MedStar obtained as a result of its misconduct and the resulting Data Breach.

**FIFTH CLAIM FOR RELIEF**
**Declaratory Judgment**
**(on behalf of Plaintiffs and the Class)**

164. Plaintiffs and Class Members incorporate all previous paragraphs as if fully set forth herein.

165. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

166. An actual controversy has arisen in the wake of the MedStar Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Personal Information and whether MedStar is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that

compromise their PII and PHI. Plaintiffs allege that MedStar's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and PHI will occur in the future.

167. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

168. MedStar continues to owe a legal duty to secure consumers' PII and PHI and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes;

169. MedStar continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII and PHI.

170. The Court also should issue corresponding prospective injunctive relief requiring MedStar to employ adequate security protocols consistent with law and industry standards to protect consumers' PII and PHI.

171. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at MedStar. The risk of another such breach is real, immediate, and substantial. If another breach at MedStar occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

172. The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to MedStar if an injunction is issued. Among other things, if another massive data breach occurs at MedStar, Plaintiffs and Class Members will likely be subjected to

fraud, identify theft, and other harms described herein. On the other hand, the cost to MedStar of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and MedStar has a pre-existing legal obligation to employ such measures.

173. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at MedStar, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose PII and PHI would be further compromised.

**SIXTH CLAIM FOR RELIEF**
**Maryland Personal Information Protection Act**
**Md. Comm. Code §§ 14-3501, *et seq*.**
**(on behalf of Plaintiffs and the Class)**

174. Plaintiffs and Class Members incorporate all previous paragraphs as if fully set forth herein.

175. Under Md. Comm. Code § 14-3503(a), "[t]o protect Personal Information from unauthorized access, use, modification, or disclosure, a business that owns or licenses Personal Information of an individual residing in the State shall implement and maintain reasonable security procedures and practices that are appropriate to the nature of Personal Information owned or licensed and the nature and size of the business and its operations."

176. MedStar is a business that owns or licenses computerized data that includes Personal Information as defined by Md. Comm. Code §§ 14-3501(b)(1) and (2).

177. Plaintiffs and Class Members are "individuals" and "customers" as defined and covered by Md. Comm. Code §§ 14-3502(a) and 14-3503.

178. Plaintiff's and Class Members' PII and PHI includes Personal Information as covered under Md. Comm. Code § 14-3501(d).

179. MedStar did not maintain reasonable security procedures and practices appropriate to the nature of the Personal Information owned or licensed and the nature and size of its business and operations in violation of Md. Comm. Code § 14-3503.

180. The Data Breach was a "breach of the security of a system" as defined by Md. Comm. Code § 14-3504(1). Under Md. Comm. Code § 14-3504(b)(1), "[a] business that owns or licenses computerized data that includes Personal Information of an individual residing in the State, when it discovers or is notified of a breach of the security system, shall conduct in good faith a reasonable and prompt investigation to determine the likelihood that Personal Information of the individual has been or will be misused as a result of the breach."

181. Under Md. Comm. Code §§ 14-3504(b)(2) and 14-3504(c)(2), "[i]f, after the investigation is concluded, the business determines that misuse of the individual's Personal Information has occurred or is reasonably likely to occur as a result of a breach of the security system, the business shall notify the individual of the breach" and that notification "shall be given as soon as reasonably practical after the business discovers or is notified of the breach of a security system."

182. Because MedStar discovered a security breach and had notice of a security breach, MedStar had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Md. Comm. Code §§ 14-3504(b)(2) and 14-3504(c)(2).

183. By failing to disclose the Data Breach in a timely and accurate manner, MedStar violated Md. Comm. Code §§ 14-3504(b)(2) and 14-3504(c)(2).

184. As a direct and proximate result of MedStar's violations of Md. Comm. Code §§ 14-3504(b)(2) and 14-3504(c)(2), Plaintiffs and Class Members suffered damages, as described above.

185. Pursuant to Md. Comm. Code § 14-3508, MedStar's violations of Md. Comm. Code §§ 14-3504(b)(2) and 14-3504(c)(2) are unfair or deceptive trade practices within the meaning of the Maryland Consumer Protection Act, 13 Md. Comm. Code §§ 13-101 et seq. and subject to the enforcement and penalty provisions contained within the Maryland Consumer Protection Act.

186. Plaintiffs and Class Members seek relief under Md. Comm. Code §13-408, including actual damages and attorney's fees.

**<u>SEVENTH CLAIM FOR RELIEF</u>**
**Maryland Consumer Protection Act**
**Md. Code Ann., Com. Law §§ 13-301, *et seq.***
**(on behalf of Plaintiffs and the Class)**

187. Plaintiffs and Class Members incorporate all previous paragraphs as if fully set forth herein.

188. MedStar is a person as defined by Md. Code Comm. Law § 13-101(h).

189. MedStar's conduct as alleged herein related to "sales," "offers for sale," or "bailment" as defined by Md. Code Comm. Law § 13-101(i) and § 13-303.

190. Class Members are "consumers" as defined by Md. Code Comm. Law § 13-101(c).

191. MedStar advertises, offers, or sell "consumer goods" or "consumer services" as defined by Md. Code Comm. Law § 13-101(d).

192. MedStar advertised, offered, or sold goods or services in Maryland and engaged in trade or commerce directly or indirectly affecting the people of Maryland.

193. MedStar engaged in unfair and deceptive trade practices, in violation of Md. Code, Com. Law § 13-301, including:

a. False or misleading oral or written representations that have the capacity, tendency, or effect of deceiving or misleading consumers;

b. Representing that consumer goods or services have a characteristic that they do not have;

c. Representing that consumer goods or services are of a particular standard, quality, or grade that they are not;

d. Failing to state a material fact where the failure deceives or tends to deceive;

e. Advertising or offering consumer goods or services without intent to sell, lease, or rent them as advertised or offered;

f. Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services or the subsequent performance with respect to an agreement, sale lease or rental.

194. MedStar engaged in these unfair and deceptive trade practices in connection with offering for sale or selling consumer goods or services in violation of Md. Code, Comm. Law § 13-303, including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' PII and PHI, which was a direct and proximate cause of the Data Breach;

b. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures

following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII and PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Maryland Personal Information Protection Act, Md. Code, Comm. Law § 14-3503, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Class Members' PII and PHI, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII and PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Maryland Personal Information Protection Act, Md. Code, Comm. Law § 14-3503;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' PII and PHI; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII and PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, and the Maryland Personal Information Protection Act, Md. Code, Com. Law § 14-3503.

195. MedStar's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of MedStar's data security and ability to

protect the confidentiality of consumers' PII and PHI. MedStar's misrepresentations and omissions would have been important to a significant number of consumers in making financial decisions.

196. MedStar intended to mislead Plaintiffs and Class Members and induce them to rely on its misrepresentations and omissions.

197. Had MedStar disclosed to Plaintiffs and Class Members that its data systems were not secure and, thus, vulnerable to attack, MedStar would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, MedStar received, maintained, and compiled Plaintiffs' and Class Members' PII and PHI as part of the services MedStar provided and for which Plaintiffs and Class Members paid without advising Plaintiffs and Class Members that MedStar's data security practices were insufficient to maintain the safety and confidentiality of Plaintiffs' and Class Members' PII and PHI. Accordingly, Plaintiffs and the Class Members acted reasonably in relying on MedStar's misrepresentations and omissions, the truth of which they could not have discovered.

198. MedStar acted intentionally, knowingly, and maliciously to violate Maryland's Consumer Protection Act, and recklessly disregarded Plaintiffs' and Class Members' rights. MedStar's past data breaches and breaches within the hospitality industry put it on notice that its security and privacy protections were inadequate.

199. As a direct and proximate result of MedStar's unfair and deceptive acts and practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MedStar as they would not have paid MedStar for goods

and services or would have paid less for such goods and services but for MedStar's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their PII and PHI; and an increased, imminent risk of fraud and identity theft.

200. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including damages, restitution, disgorgement, injunctive relief, and attorneys' fees and costs.

## EIGHTH CLAIM FOR RELIEF
**District of Columbia Consumer Security Breach Notification Act**
**D.C. Code §§ 28-3851, *et seq.***
**(on behalf of Plaintiffs and the Class)**

201. Plaintiffs and Class Members incorporate all previous paragraphs as if fully set forth herein.

202. MedStar is a business that owns or licenses computerized data that includes Personal Information as defined by D.C. Code § 28-3852(a).

203. Plaintiffs and Class Members' PII and PHI includes Personal Information as covered under D.C. Code § 28-3851(3).

204. MedStar is required to accurately notify Plaintiffs and Class Members if it becomes aware of a breach of its data security system in the most expedient time possible and without unreasonable delay under D.C. Code § 28-3852(a)

205. Because MedStar was aware of a breach of its security system, MedStar had an obligation to disclose the data breach in a timely and accurate fashion as mandated by D.C. Code § 28-3852(a).

206. By failing to disclose the Data Breach in a timely and accurate manner MedStar violated D.C. Code § 28-3852(a).

207. As a direct and proximate result of MedStar's violations of D.C. Code § 28-3852(a), Plaintiffs and Class Members suffered damages, as described above.

208. Plaintiffs and Class Members seek relief under D.C. Code § 28-3853(a), including actual damages.

**NINTH CLAIM FOR RELIEF**
**District of Columbia Consumer Protection Procedures Act**
**D.C. Code §§ 28-3904, *et seq.***
**(on behalf of Plaintiffs and the Class)**

209. Plaintiffs and Class Members incorporate all previous paragraphs as if fully set forth herein.

210. MedStar is a "person" as defined by D.C. Code § 28-3901(a)(1).

211. MedStar is a "merchant" as defined by D.C. Code § 28-3901(a)(3).

212. Plaintiffs and Class Members are "consumers" who purchased or received goods or services for personal, household, or family purposes, as defined by D.C. Code § 28-3901.

213. MedStar advertised, offered, or sold goods or services in the District of Columbia and engaged in trade or commerce directly or indirectly affecting the people of the District of Columbia.

214. MedStar engaged in unfair, unlawful, and deceptive trade practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of goods and services in violation of D.C. Code § 28-3904, including:

a. Representing that goods or services have characteristics that they do not have;

b. Representing that goods or services are of a particular standard, quality, grade, style, or model, when they are of another;

c. Misrepresenting a material fact that has a tendency to mislead;

d. Failing to state a material fact where the failure is misleading;

e. Advertising or offering goods or services without the intent to sell them as advertised or offered;

f. Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

g. MedStar's unfair, unlawful, and deceptive trade practices include:

h. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' PII and PHI, which was a direct and proximate cause of the Data Breach;

i. Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

j. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII and PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

k. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and Class Members' PII and PHI, including by implementing and maintaining reasonable security measures;

l. Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII and PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45;

m. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' PII and PHI; and

n. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' PII and PHI, including duties imposed by the FTC Act, 15 U.S.C. § 45.

215. MedStar's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of MedStar's data security and ability to protect the confidentiality of consumers' PII and PHI.

216. MedStar intended to mislead Plaintiffs and Class Members and induce them to rely on its misrepresentations and omissions.

217. The above unfair and deceptive practices and acts by MedStar were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

218. MedStar acted intentionally, knowingly, and maliciously to violate the District of Columbia's Consumer Protection Procedures Act, and recklessly disregarded Plaintiffs' and Class Members' rights. MedStar's past data breaches and breaches within the hospitality industry put it on notice that its security and privacy protections were inadequate.

219. As a direct and proximate result of MedStar's unfair, unlawful, and deceptive trade practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with MedStar as they would not have paid MedStar for goods and services or would have paid less for such goods and services but for MedStar's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their PII and PHI; and an increased, imminent risk of fraud and identity theft.

220. Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including actual damages, restitution, injunctive relief, punitive damages, attorneys' fees and costs, the greater of treble damages or $1,500 per violation, and any other relief that the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, individually and on behalf of all others similarly situated, pray for relief as follows:

a. for an Order certifying the Class as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

b. for equitable relief enjoining MedStar from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII and PHI, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

c. for equitable relief compelling MedStar to use appropriate cybersecurity methods and policies with respect to PII and PHI collection, storage, and protection, and to disclose with specificity to Class Members the types of PII and PHI compromised;

d. for an award of damages, including actual, nominal, consequential, enhanced compensatory, and punitive damages, as allowed by law in an amount to be determined;

e. for an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. for prejudgment interest on all amounts awarded; and

g. such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 10, 2025

Respectfully submitted,

*/s/ Panida A. Anderson*
Panida A. Anderson (D. Md. Bar No. 30780)
**BAILEY & GLASSER LLP**
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
(202) 499-1476
panderson@baileyglasser.com

Bart D. Cohen (*pro hac vice* forthcoming)
**BAILEY & GLASSER LLP**
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com

*Attorneys for Plaintiffs and the Proposed Class*